**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARTIN WEINBERG** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  22-1573** |
| | : | |
| **LEGION ATHLETICS, INC., MICHAEL** | : | |
| **MATTHEWS, CHRISTOPHER** | : | |
| **BARAKAT, SERDAR TUNCALI, DR.** | : | |
| **JOSHUA MAHER, DR. BRIAN GRANT,** | : | |
| **DR. MIKE RUSCIO, DR. TANEI RICKS,** | : | |
| **DR. KASEY JO ORVIDAS, EUGENE K.** | : | |
| **CHOI, M.D., TYLER CLINARD, DR.** | : | |
| **NOORA ALAKULPPI, DR. AYLIA** | : | |
| **MOHAMMADI, DENNIS BOJRAB II,** | : | |
| **M.D., DR. JESSIE HOFFMAN, ASTRID** | : | |
| **NARANJO** | : | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                                        **July 21, 2023**

I.        <u>Introduction</u>

This is a case about too much of a good thing, or at least, too much of something.

In the early days of the COVID-19 pandemic, plaintiff Martin Weinberg decided to research ways to protect himself.  He saw an online company's internet advertisements about a dietary supplement that could boost his immune system and prevent viral infections.  The company described its products as highly safe and backed by good science.  Mr. Weinberg believed what he read.  So he bought the supplement and took the recommended amount daily for almost a year.  Unbeknownst to him, the supplement contained a dangerously high concentration of a plant extract that is known to cause liver damage when consumed in high amounts.  He ingested so much of it over time that he became ill — hence this lawsuit.  The defendants are the company, its president, and the scientists who review its products.  They

move to dismiss under several theories, challenging both personal jurisdiction and the legal sufficiency of Mr. Weinberg's claims.

We first conclude that the operative complaint does not establish personal jurisdiction over the president and scientists because it does not allege that they had sufficient minimum contacts with Pennsylvania.  Further, Mr. Weinberg has adequately stated the remainder of his challenged claims, except for his claim of negligence per se, which is not separately cognizable as a matter of law.  Therefore, for the reasons discussed below, we grant defendants' motion in part and deny it in part.

## II.   <u>Factual Allegations</u>

Defendant Legion Athletics, Inc. ("Legion") is a health and fitness company incorporated and headquartered in Florida.  DI 1 ¶¶ 2, 22.  Legion maintains a website but not a brick-and-mortar store.  *Id.* ¶ 22.  It sells fitness and nutrition plans, protein powders, and supplements to aid weight loss and wellness.  *Id.*  On its website, Legion describes itself as committed to safety, transparency, and research-backed formulas amidst an industry that is "full of misinformation, disinformation, idiots, liars, and hucksters."  *Id.* ¶¶ 23-27.  Defendant Michael Matthews ("Matthews") is Legion's founder, president, and apparent spokesperson. *Id.* ¶¶ 37-38.  He resides in Florida.  *Id.* ¶ 3.

The remaining defendants are members of Legion's Scientific Review Board ("Review Board") and reside in Florida, Arizona, Kansas, Indiana, Nevada, Tennessee, North Carolina, California, Michigan, Ohio, Canada, Finland, and Australia.[1]  Legion's website

---

[1] We refer collectively to defendants Christopher Barakat, Serdar Tuncali, Dr. Joshua Maher, Dr. Brian Grant, Dr. Mike Ruscio, Dr. Tanei Ricks, Dr. Kasey Jo Orvidas, Dr. Eugene K. Choi, Tyler Clinard, Dr. Noora Alakulppi, Dr. Aylia Mohammadi, Dr. Dennis Bojrab II, Dr. Jessie Hoffman, and Astrid Naranjo as the "Review Board defendants."  DI 1 ¶ 4-17. And

claims that the Review Board evaluates "all of [Legion's] products and publications" and analyzes the "weight [of] the evidence on any and all topics relating to diet, exercise, supplementation, and more." *Id.* ¶ 29.  It "ensure[s] all key information and claims are backed by high-quality scientific research and [are] explained simply and precisely." *Id.* ¶ 31.

Mr. Weinberg is a marketing executive and resident of Pennsylvania.  *Id.* ¶¶ 1, 51.  He has always been health conscious, so when he learned of the burgeoning COVID-19 pandemic in March of 2020, he took to the internet to research preventative measures.  *Id.* ¶¶ 34-36.  It was there that he learned of "Immune Support" ("Immune"): an over-the-counter supplement sold by Legion.  *Id.*  Mr. Weinberg viewed a Facebook Live video in which defendant Matthews unveiled Immune to the public and touted its health benefits, including its purported effectiveness in warding off the COVID-19 virus.  *Id.* ¶¶ 36-38.  Matthews further described the product as approved by the Review Board and supported by "100 percent transparent" research.  *Id.* ¶ 39.

Encouraged by Matthews's endorsement and Legion's promises, Mr. Weinberg purchased Immune.  *Id.* ¶ 49.  He took the recommended dose (six capsules daily)[2] for nearly one year, though noticed a marked decline in his health during this period.  *Id.* ¶¶ 49-53.  After months of unusual symptoms, Mr. Weinberg was hospitalized for three days.  *Id.* ¶¶ 54-56.  His doctors observed abnormal liver function and jaundice.  *Id.* ¶¶ 56-57.  To Mr.

_____

we refer to Matthews and the Review Board defendants together as the "individual defendants."

[2] Legion did not indicate a maximum dose at which Immune could be consumed safely.  *Id.* ¶¶ 47-48.  Immune's label merely directed users to "[t]ake 6 capsules daily.  For optimal results, take 2 capsules every 3-5 hours when you're around sick people (to prevent sickness) or feel you might be getting sick or are sick."  *Id.* ¶ 47.

Weinberg's surprise, they blamed an ingredient in Immune called "African geranium." *Id.* ¶¶ 55-58. According to hospital staff, African geranium can "cause liver injury/failure" at high doses and Immune contained so much of it that Mr. Weinberg's long-term use caused him "possible hepa[to]toxicity."[3] *Id.* ¶¶ 57-58. Legion did not warn him about these side effects, so having been "poison[ed]" by the very supplement he took to promote his health, he brought a host of tort, consumer protection, and warranty claims against Legion, Matthews, and the Review Board defendants. *Id.* ¶¶ 47-48.

### III.   Defendants' Motion to Dismiss

On June 27, 2022, defendants moved to dismiss all but one of Mr. Weinberg's claims under Rules 12(b)(2) and 12(b)(6). DI 6. Defendants assert several arguments in support of their motion. DI 6-3.

First, the individual defendants move to dismiss each claim against them[4] under Rule 12(b)(2) for lack of personal jurisdiction, or in the alternative, under Rule 12(b)(6) based on the "participation theory of liability." DI 6-1 at 1-2. Second, Legion moves to dismiss four of Mr. Weinberg's claims against it under Rule 12(b)(6), including his Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL")[5] claim, his Magnuson-Moss Warranty Act ("MMWA") claim, his breach of implied warranties claim, and his unjust

---

[3] According to Mr. Weinberg, a safe dose of African geranium is between 30 and 360 milligrams per day for a short number of days. *Id.* ¶ 45. Meanwhile, Legion's recommended dose of Immune contains a remarkable 800 milligrams per day, indefinitely. *Id.* ¶ 47.

[4] Mr. Weinberg's complaint asserts three claims against Matthews and the Review Board defendants, each grounded in negligence: counts 5, 6, and 7. *See* DI 1 ¶¶ 103-14, 115-27, 128-32.

[5] Legion also moves to strike paragraph 70 from Mr. Weinberg's UTPCPL count because it invokes a statute that does not, according to Legion, carry a private right of action. DI 6-3 at 14. We discuss *infra*.

enrichment claim.  DI 6-1 at 2.  Third, all defendants move to dismiss Mr. Weinberg's negligence per se claim as not cognizable under Pennsylvania law.  DI 6-3 at 24.

Mr. Weinberg counters in an opposition brief.  DI 7.  He first argues that we do have personal jurisdiction over the individual defendants, but in the alternative, should grant jurisdictional discovery or leave to amend in lieu of dismissing them.  *Id.* at 6, 9.  Next, Mr. Weinberg disagrees that the participation theory of liability shields the individual defendants from liability here.  *Id.* at 10.  Finally, he argues that he has sufficiently stated the remainder of his challenged claims under Rule 12(b)(6).  *Id.* at 12-23.

We heard oral argument by the parties on April 10, 2023.  DI 17.  Defendants' motion is thus ripe for disposition, and for the reasons discussed below, granted in part and denied in part.  We dismiss the individual defendants from the case for lack of personal jurisdiction, dismiss Mr. Weinberg's negligence per se claim, and grant him leave to amend his complaint.

## IV.   Standard of Review

We analyze defendant's motion to dismiss under the familiar Rule 12(b)(6) standard. To survive defendant's motion, Mr. Weinberg's amended complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).  Deciding whether a complaint is facially plausible is "context specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 663-64.

"Assessing plausibility under *Twombly* and *Iqbal* is a three-step process." *McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 661 (E.D. Pa. 2021). "The first step in that process requires an articulation of the elements of the claim." *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327 (3d Cir. 2022). The second step requires that we "identify those allegations that, being merely conclusory, are not entitled to the presumption of truth." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016). We must not extend the presumption of truth to Mr. Weinberg's allegations that are "so threadbare or speculative that they fail to cross the line between the conclusory and the factual." *Id.* at 790 (quoting *Peñalbert-Rosa v. Fortuño-Burset*, 631 F.3d 592, 595 (1st Cir. 2011)). Finally, we must assume the veracity of Mr. Weinberg's well-pleaded factual allegations to "determine whether they plausibly give rise to an entitlement to relief." *McDermid*, 520 F. Supp. 3d at 661 (quoting *Connelly*, 809 F.3d at 787).

## V.     Analysis

### a.   Mr. Weinberg has not established that we have personal jurisdiction over the individual defendants or that jurisdictional discovery is justified.  But we will grant him leave to amend his complaint.

The individual defendants argue that we do not have personal jurisdiction over them because they have not had any contact with Pennsylvania. DI 6-3 at 5. Mr. Weinberg argues that Legion's online marketing efforts are attributable to the individual defendants for purposes of a jurisdictional analysis and are sufficient to hale them into court here. We disagree, but grant Mr. Weinberg leave to amend his complaint.

### i.   Mr. Weinberg has not shown that the individual defendants had the requisite "sufficient minimum contacts" with Pennsylvania.

Because the individual defendants do not reside in Pennsylvania, our analysis begins with Rule 4(e) of the Federal Rules of Civil Procedure. Rule 4(e) permits us to exercise

6

personal jurisdiction over non-resident defendants to the extent permitted by Pennsylvania law. *Mellon Bank PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1221 (3d Cir. 1992). Pennsylvania permits personal jurisdiction over non-resident defendants to the constitutional limits of the Due Process Clause of the Fourteenth Amendment. *North Penn Gas Co. v. Corning Natural Gas Corp.*, 897 F.2d 687, 689 (3d Cir. 1990) (citing 42 Pa.Con. Stat.Ann. § 5322(b)); *Nissley v. JLG Indus., Inc.*, 452 A.2d 865, 866 (Pa. Super. 1982).

The Due Process Clause allows two types of personal jurisdiction: general and specific. *Mallory v. Norfolk Southern Ry.*, __ S. Ct. __, 2023 WL 4187749, *20 (June 27, 2023); *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007). General personal jurisdiction is off the table. For specific jurisdiction, we turn to the "minimum contacts" framework set forth by *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) and its progeny.[6] Under this framework, we may exercise specific jurisdiction where 1) a non-resident defendant has sufficient minimum contacts with Pennsylvania, 2) the claim against the defendant arises out of those contacts, and 3) the exercise of jurisdiction would not offend the "traditional notions of fair play and substantial justice." *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1122 (W.D. Pa. 1997).

The first prong of the minimum contacts test requires that a defendant "purposefully avail[ed]" themselves of a forum state by creating a substantial connection there. *See Burger*

---

[6] "In the absence of general jurisdiction, specific jurisdiction permits a court to exercise personal jurisdiction over a non-resident defendant where the 'relationship between the defendant and the forum falls within the 'minimum contacts' framework' of *International Shoe Co. v. Washington*, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945) and its progeny." *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1122 (W.D. Pa. 1997).

*King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).   Random, fortuitous contacts with a forum state are not sufficient.  *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984).

      Here, the parties dispute whether the individual defendants contacted Pennsylvania at all.  Mr. Weinberg does not allege that they live or work in Pennsylvania.  DI 1 ¶¶ 2-17.  Mr. Weinberg does not allege that they traveled to Pennsylvania.  DI 8 at 4.  Mr. Weinberg does not allege that they spoke with him or anyone else from Pennsylvania about his Immune purchase.  *Id.*  Nevertheless, he maintains that because the individual defendants occupy executive positions at Legion, Legion's contacts with Pennsylvania count as their own for the purposes of our jurisdictional analysis.  DI 7 at 8.  Defendants disagree.  DI 8 at 3.  But we need not decide, for even if they did, those contacts would not give rise to specific jurisdiction here.

      Mr. Weinberg identifies Legion's website and its Facebook Live video about Immune as its only contacts with the state.[7]  Though the advent of digital commerce has complicated the minimum contacts analysis, the central inquiry remains the same: whether a non-resident purposefully availed themselves of a particular forum.  *Zippo*, 952 F. Supp. at 1124.  To assess whether internet-based contacts amount to purposeful availment, courts in this Circuit follow a "sliding scale test"[8] wherein "the likelihood that personal jurisdiction can be

---

    [7] Mr. Weinberg alleges that while in Pennsylvania, he viewed a Facebook Live video and Legion's website materials about Immune. DI 1 ¶¶ 35-39, 49.

    [8] At one end of the "sliding scale" are defendants who enter contracts with residents of foreign forums and repeatedly transmit files to those forums over the internet; this conduct reflects intentional interaction with residents of the forum and thus gives rise to specific jurisdiction.  *Hadnagy*, 2023 WL 114689, at *11 (citing *Zippo*, 952 F. Supp. at 1124)*; see also Toys*, 318 F.3d at 452.
    On the opposite end of the scale are defendants who merely post information on a website accessible to users in foreign forums; such passive websites do not give rise to

constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the [i]nternet." *Hadnagy v. Moss*, 2023 WL 114689, *11 (E.D. Pa. Jan. 5, 2023) (citations omitted); *see also Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 452 (3d Cir. 2003); *Zippo*, 952 F. Supp. at 1124.

      Maintaining a website, even a commercially interactive website, does not alone subject a non-resident defendant to specific jurisdiction in a user's state. *Toys*, 318 F.3d at 452-54. Rather, there must be evidence that the defendant "directly target[ed] its website to the state [or] knowingly interact[ed] with residents of the forum state via its website." *Id.* As such, posting a generalized advertisement on the internet does not subject the advertiser to jurisdiction in a plaintiff's home state without "'something more' to indicate that the defendant purposefully (albeit electronically) directed his activity in a substantial way to the forum state." *S. Morantz, Inc. v. Hang & Shine Ultrasonics, Inc.*, 79 F. Supp. 2d 537, 540 (E.D. Pa. 1999) (citations omitted).

      Here, Mr. Weinberg does not plead any facts indicating that Legion targeted its website or the Facebook Live video at Pennsylvania, that it intended to interact with residents there, that it intended to conduct business there, or that it otherwise created any "substantial"

---

specific jurisdiction because they do not target a particular forum. *Hadnagy*, 2023 WL 114689, at *11 (citing *Zippo*, 952 F. Supp. at 1124).

      Somewhere in the middle are interactive websites on which users can exchange information with a host computer; "in these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." *Zippo*, 952 F. Supp. at 1124.

      We cannot say where on the sliding scale Legion's online content falls; Mr. Weinberg's complaint offers virtually no information about the interactivity of Legion's website or the commercial nature of information shared on it. The same is true of the Facebook Live video. But it does not particularly matter here. The whole exercise is aimed at assessing whether a defendant's online contacts purposely targeted a forum. It is evident that Legion's materials did not target Pennsylvania at all. *See infra*.

connection with the state.  *See Burger King*, 471 U.S. at 475; *Toys*, 318 F.3d at 454.  Instead, Mr. Weinberg alleges that he stumbled upon Legion's Facebook Live video and its website while researching COVID-19 prevention online.  DI 1 ¶¶ 36, 49.  This makes his viewership the only connection between Pennsylvania and Legion's online content.  But it is well established that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum state . . . [i]t is essential in each case that there be some act by which the *defendant* purposefully avails itself of the privilege of conducting activities within the forum."  *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 65 (3d Cir. 1984) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  We can identify no such act here, and as such, Mr. Weinberg has not met his burden to establish personal jurisdiction over the individual defendants.[9]

Because Mr. Weinberg has not met the first prong of the minimum contacts test, we need not explore the remaining two.  Likewise, because we do not have personal jurisdiction over the individual defendants, the participation theory of liability may be set aside.

        ii.   <u>We Mr. Weinberg leave to amend but will not permit jurisdictional discovery.</u>

Mr. Weinberg requests that in lieu of dismissing the individual defendants for lack of personal jurisdiction, we either: 1) grant him leave to add a fraudulent misrepresentation claim against them, or 2) allow jurisdictional discovery.  DI 7 at 15.  While the operative complaint

---

[9] When a defendant challenges personal jurisdiction, it is the plaintiff's burden to establish that jurisdiction is proper.  *Mellon*, 960 F.2d at 1223 (3d Cir. 1992) (citing *Carteret Savings Bank v. Shushan*, 954 F.2d 141 (3d Cir. 1992), *cert. denied* 506 U.S. 817 (1992)).  Plaintiffs must meet that burden by showing "sufficient contacts between the defendant and the forum state." *Mellon*, 960 F.2d at 1223 (*citing Provident Nat. Bank v. Cal. Fed. Sav. & Loan Assoc.*, 819 F.2d 434 (3d Cir. 1987)).

does not presently meet the heightened pleading standard for fraud claims,[10] and although Mr. Weinberg does not explain how amendment could cure our lack of personal jurisdiction,[11] leave to amend must be freely granted. *Winer Family Trust v. Queen*, 503 F.3d 319, 330-31 (3d Cir. 2007) (citing Fed. R. Civ. P. 15(a)(2)). We therefore grant Mr. Weinberg leave to amend as he requests, but remind him of the demanding standard he faces should he choose to do so.

Further, we will not permit jurisdictional discovery with respect to the individual defendants. First, jurisdictional discovery generally relates to corporate defendants to determine whether they do business in a particular state; the presumption in favor of jurisdictional discovery is reduced with respect to individual defendants. *Mass. Sch. of Law at Andover v. ABA*, 107 F.3d 1026, 1042 (3d Cir. 1997). Second, we need not permit jurisdictional discovery where a plaintiff "cannot allege" the facts necessary to establish jurisdiction. *Id.* Based on Mr. Weinberg's complaint and the parties' representations at oral argument, we think jurisdictional discovery unlikely to reveal contacts sufficient to confer

---

[10] Claimants must plead fraud claims with "particularity." Fed. R. Civ. P. 9(b); *Lum v. Bank of America*, 361 F.3d 217, 223 (3d Cir. 2004). To do so, they must allege "the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation." *Lum*, 361 F.3d at 223-34. Nothing of the sort appears in Mr. Weinberg's complaint. *See generally* DI 1.

[11] Perhaps Mr. Weinberg seeks to add a claim for fraudulent misrepresentation against the individual defendants because the "effects test" replaces the traditional minimum contacts test for specific jurisdiction where the cause of action is an intentional tort. *See Calder v. Jones*, 465 U.S. 783, (1984). The effects test permits specific jurisdiction where 1) a defendant committed an intentional tort, 2) the plaintiff felt the harm of the intentional tort in the in the forum state, and 3) the defendant expressly aimed the tortious conduct at the forum state. *See Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007). We doubt that the effects test would confer specific jurisdiction here given that it requires a forum state to be the "focal point" of tortious activity. *Id.* But Mr. Weinberg may nevertheless amend his complaint as requested if the facts allow.

11

specific jurisdiction over the individual defendants. *Toys*, 318 F.3d at 456 (courts should

permit jurisdictional discovery where plaintiff presents factual allegations suggesting "with

reasonable particularity" the possible existence of sufficient contacts with the forum state

(citations omitted)). The parties are free to revisit the issue should Mr. Weinberg choose to

amend his complaint with new claims against the individual defendants, but as of now,

jurisdictional discovery is not justified.

### b. Mr. Weinberg has adequately pleaded a UTPCPL claim.

Mr. Weinberg maintains a claim against Legion for breach of the UTPCPL, albeit not

in reference to a particular subsection of the statute. DI 1 ¶¶ 66-72.[12] Legion argues that

although Mr. Weinberg's complaint does not invoke any subsections of the UTPCPL, it

describes conduct prohibited by subsections (v),[13] (vii),[14] (ix),[15] and (xxi),[16] and thus

---

[12] Section 3 of the UTPCPL prohibits "unfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201-3. Section 2 of the UTPCPL defines twenty practices that constitute "unfair methods of competition or deceptive acts or practices." *See* 73 P.S. § 201-2(4)(i)-(xx).

[13] Subsection (v) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have." 73 P.S. § 201-2(4)(v).

[14] Subsection (vii) prohibits "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another." 73 P.S. § 201-2(4)(vii).

[15] Subsection (ix) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." 73 P.S. § 201-2(4)(vii).

[16] Subsection (xxi) is known as the "catchall" provision of the UTPCPL. *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145, 147 (Pa. Super. Ct. 2012)). It prohibits "any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding" that does not fall under the previous twenty subsections. 73 P.S. at § 201-2(4)(xxi).

effectively alleges a claim under each.  DI 6-3 at 16.  Having attempted to cabin Mr.

Weinberg's UTPCPL claim(s) to these subsections, Legion moves to dismiss all four.

First, Legion argues that claims under subsections (v), (vii), and (xxi) fail because

these provisions of the UTPCPL apply only to transactional negotiations — not to the

advertising of products at issue here.  DI 6-3 at 16.  Second, Legion argues that a claim for

false advertising under subsection (ix) fails because Immune's marketing materials amount

merely to puffery, which is not prohibited by the UTPCPL.  DI 6-3 at 21.  Third, at oral

argument, Legion that the UTPCPL does not cover claims for damages related to personal

injuries.

Finally, Legion seeks to strike paragraph 70 from Mr. Weinberg's complaint.  DI 6-3

at 14.  Paragraph 70 falls under Mr. Weinberg's UTPCPL count and alleges that Legion

violated the UTPCPL by violating Pennsylvania's Food Safety Act ("FSA"), which prohibits

misbranding or selling misbranded food.  DI 1 ¶ 70; *see generally* 3 Pa. C.S.A. §§ 5723, 5729.

According to Legion, the FSA does not carry a private right of action so we should strike

mention of it from the complaint.  DI 6-3 at 14.

Mr. Weinberg responds in kind that while he does not allege a claim under any

specific subsection of the UTPCPL, Legion's arguments with respect to subsections (v), (vii),

(ix), and (xxi) would be unsupported if he did.  DI 7 at 20.  Mr. Weinberg also stated at oral

argument that he alleges claims for both economic *and* personal injuries.  And finally, Mr.

Weinberg clarifies that paragraph 70 of his complaint does not set forth a claim under the

FSA, but instead lists an additional ground for liability under the UTPCPL.  DI 7 at 25.  We

discuss each argument in turn.

13

The UTPCPL is a remedial statute meant to equalize the disparate positions of consumers and sellers in the marketplace. *Com., by Creamer v. Monumental Props., Inc.*, 329 A.2d 812, 817 (Pa. 1974). We must liberally construe its provisions to give effect to its purpose. *Id.* at 460. To that end, a plaintiff need not invoke a particular subsection of the UTPCPL to survive a motion to dismiss; general averments of prohibited conduct, together with justifiable reliance and resultant harm, will suffice. *Loduca v. WellPet LLC*, 549 F. Supp. 3d 391, 400 (E.D. Pa. 2021) (citing *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004)).

Here, Mr. Weinberg alleges that he took the recommended dose of Immune printed on its packaging. DI 1 ¶ 49. He relied on Legion's representations that it was safe. *Id.* But he nevertheless wound up sick, and his doctors faulted Immune. *Id.* ¶¶ 56-58. This is precisely the sort of misrepresentation that the UTPCPL prohibits, even if not pled under a particular one of its subsections. *See Loduca*, 549 F. Supp. 3d at 400 (denying motion to dismiss a UTPCPL claim where "the [p]laintiffs' [c]omplaint generally aver[red] that the feeding information on the labels of the bags of . . . [d]efendants' dry dog food brands misrepresent[ed] the correct feeding recommendations for the vast majority of canine pets"); *see also Gabriel v. O'Hara*, 534 A.2d 488, 494 (Pa. Super. Ct. 1987) (noting that the UTPCPL "encompasses an array of practices that might be analogized to . . . false advertising . . . and breach of warranty"). And because Mr. Weinberg does not invoke a specific subsection of the UTPCPL on the face of his complaint, we need not address Legion's arguments as to which ones may or may not apply here.

We are unpersuaded by Legion's remaining arguments.  It is true that the UTPCPL does not permit claims relating only to personal injury,[17] and Mr. Weinberg does allege personal injury.  But he also alleges economic injury.  *See* DI 1 ¶ 71 ("[Mr. Weinberg] has been harmed and suffered ascertainable loss, in that he purchased products that he otherwise would not have had he been given adequate instructions regarding a safe dose").  This is an actionable injury under the UTPCPL.  *Loduca*, 549 F. Supp. 3d at 398 (denying motion to dismiss UTPCPL claim where misrepresentations on dog food packaging "resulted in [plaintiffs] . . . purchasing more dog food than was 'otherwise necessary'").  Therefore, we will not dismiss Mr. Weinberg's UTPCPL claim on that basis.

And finally, we do not construe paragraph 70 of Mr. Weinberg's complaint to set forth a claim under the FSA.  *See* DI 7 at 25.  Rather, it sets forth an additional theory of liability under the UTPCPL.[18]  We therefore need not decide whether the FSA carries a private right of action and will not strike paragraph 70 from Mr. Weinberg's complaint.

### c.  Mr. Weinberg has adequately pleaded implied warranty and MMWA claims.

Mr. Weinberg maintains claims against Legion for breach of the implied warranty of merchantability and for violations of the MMWA.  DI 1 ¶¶ 86-98; DI 7 at 28.  Legion moves

---

[17] *Arndt v. Johnson & Johnson*, 67 F. Supp. 3d 673, 682 (E.D. Pa. 2014).

[18] Mr. Weinberg plausibly alleges facts amounting to a violation of the FSA's misbranding provision.  *See* 3 Pa.C.S. § 5729 (food labeled in a false or misleading way is misbranded).  And it is plausible that a violation of the FSA's misbranding provision constitutes a violation of the UTPCPL.  *Ash v. Cont'l Ins. Co.*, 593 Pa. 523, 530 ("even where the unlawful practice is directly addressed by another consumer-related statute, a plaintiff may nevertheless pursue his action under the UTPCPL since that statute is broad enough to encompass all claims of unfair and deceptive acts or practices in the conduct of any trade or commerce").

to dismiss both because Mr. Weinberg has not alleged that Immune lacked any stated ingredients, that it was below commercial standards, or that it failed to prevent respiratory illness.  DI 6-3 at 24.  All parties agree that because the MMWA provides a federal cause of action for breach of a state law warranty, the viability of Mr. Weinberg's MMWA claim depends on the viability of his merchantability claim.[19]

In Pennsylvania, the statutorily implied warranty of merchantability applies to every sale of goods unless specifically disclaimed.  *See* 13 Pa.C.S. § 2314; *Phillips v. Cricket Lighters*, 883 A.2d 439, 443-44 (Pa. 2005).[20]  To state a claim for breach of the implied warranty of merchantability, Mr. Weinberg must show that he purchased a product from Legion unfit for its ordinary purpose.  13 Pa.C.S. § 2314(b)(3); *Laws v. Husqvarna Grp.*, 2023 WL 1767477, *4 (E.D. Pa. Feb. 3, 2023).  Products are not fit for their ordinary purpose where they do not "have an inherent soundness which makes them suitable for the purpose for which they are designed."  *Barton v. Lowe's Home Ctrs., Inc.*, 124 A.3d 349, 357 (E.D. Pa. 2015) (quoting *Gall v. Allegheny County Health Dep't*, 521 Pa. 68, 75 (1989).  For example, products are not fit for their ordinary purpose if they are not safe.  *Morello v. Kenco Toyota Lift*, 142 F. Supp. 3d 378, 390 (E.D. Pa. 2015) (the safety of a forklift "goes to its ordinary purpose"); *Hornberger v. GMC*, 929 F. Supp. 884, 888 (E.D. Pa. 1996) (unsafe cars are not merchantable); *Van Scoyoc v. Gen. Foam Corp.*, 7 Pa. D. & C.4th 621, 626 (Pa. Com. Pl.

---

[19] DI 6-3 at 22; DI 7 at 27.  *See also Guardavacarro v. Home Depot*, 2017 WL 3393812, *24 (D.N.J. May 27, 2016) ("MMWA claims are coextensive with underlying state law breach of warranty claims and are therefore, dependent on, and derivative of, said state claims for survival in a motion to dismiss.").

[20] Neither party has argued that the implied warranty of merchantability was disclaimed with respect to Mr. Weinberg's purchase of Immune.

1990) (merchantability requires a product to be "fit and safe for [its] anticipated and intended use").

Here, Mr. Weinberg establishes each element of his merchantability claim. He alleged that he purchased Immune from Legion, that he consumed the recommended dose, and that he later suffered symptoms serious enough to "put him in the hospital," where medical professionals linked his symptoms to Immune. DI 1 ¶¶ 49-62; DI 7 at 28. Despite Legion's arguments to the contrary, it is of no consequence to our analysis whether Immune effectively prevented respiratory illness, whether it lacked any stated ingredients, or whether it met commercial standards. *See, e.g.*, *Johansson v. Cent. Garden & Pet Co.*, 804 F. Supp. 2d 257, 264 (D.N.J. 2011) ("[W]hile the product may have been effective at killing fleas and ticks, this effectiveness ceases to matter if the product was 'unreasonably dangerous' while doing so . . . . [t]he Court agrees with [p]laintiffs that their factual allegations state a claim for breach of implied warranty of merchantability, as they allege that the [p]roducts do not safely kill fleas and ticks and are therefore unfit."). Mr. Weinberg has plausibly alleged that Immune was unsafe at its recommended dose and therefore unfit for its ordinary purpose; that is enough. And because he has sufficiently stated a claim for breach of a state implied warranty, he has also stated a claim for violation of the MMWA. *See Guardavacarro*, 2017 WL 3393812, at *24.

> **d. Mr. Weinberg has adequately pleaded an unjust enrichment claim.**

Mr. Weinberg maintains a claim for unjust enrichment against Legion. DI ¶¶ 99-102. On this point, Legion argues that it is mutually exclusive with Mr. Weinberg's allegations of a contract for the sale of goods between the parties. DI 6-3 at 15.

In Pennsylvania, there are two species of unjust enrichment claims. *Silva v. Rite Aid Corp.*, 416 F. Supp. 3d 394, 403 (M.D. Pa. 2019). The first sounds in quasi-contract and may be pled in the alternative to a breach of contract claim where the parties dispute the existence, validity, or scope of a contract. *Vantage Learning (USA), LLC v. Edgenuity, Inc.*, 246 F. Supp. 3d 1097, 1100 (E.D. Pa. 2017). The second may be pled as a companion claim to some underlying tort. *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris*, 171 F.3d 912, 936 (3d Cir. 1999).

It is not apparent which type of unjust enrichment claim Mr. Weinberg brings — he argues that he can proceed under either theory. DI 7 at 21. Mr. Weinberg's claim is clearly viable if brought as a companion to his negligence claims. DI 1 ¶¶ 103-14, 128-32; *Steamfitters*, 171 F.3d at 936. But he argues that his claim is also viable as a quasi-contract claim brought in the alternative to a breach of contract. DI 7 at 21. We disagree. Mr. Weinberg has not advanced a breach of contract claim, and in fact questions whether the allegations in his complaint would support one. DI 1; DI 7 at 21. We do not see how Mr. Weinberg's unjust enrichment claim could be pled in the alternative to a claim that does not appear in the complaint.[21] Therefore, we consider his unjust enrichment claim to sound in tort and will allow it to proceed on that basis alone.

### e. Mr. Weinberg's negligence per se claim is not cognizable as a matter of law.

Mr. Weinberg advances a negligence per se claim against all defendants. DI 1 ¶¶ 115-127. Legion argues that such a claim is not cognizable as a matter of law. DI 6-3 at 25. We agree.

---

[21] A party pleads a claim in the alternative when it "set[s] out *two* or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." Fed. R. Civ. P. 8(d)(2) (emphasis added).

Where a plaintiff alleges negligence and negligence per se claims as separate causes of action, courts routinely treat the negligence per se claim as subsumed by the negligence claim. *See Simmons v. Simpson House, Inc.*, 224 F. Supp. 3d 406, 417 (E.D. Pa. 2016) ("Pennsylvania law does not permit Plaintiffs to plead [negligence per se] as a separate claim from general negligence"); *In re Rutter's Data Sec. Breach Litig.*, 511 F. Supp. 3d 514, 531 (M.D. Pa. 2021) ("Negligence per se, however, is not 'an independent basis of tort liability but rather establishes, by reference to a statutory scheme, the standard of care appropriate to the underlying tort.'") (cleaned up).  We will dismiss Mr. Weinberg's negligence per se claim but will permit him to pursue a negligence per se theory as part of his negligence claim.

## VI. <u>CONCLUSION</u>

For all the above reasons, defendants' motion is granted in part and denied in part.  We dismiss the individual defendants for lack of personal jurisdiction, dismiss Mr. Weinberg's negligence per se claim, and grant him leave to amend his complaint.